IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD LARRY LOCY | ) | Criminal No. 16-240 |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM IN AID OF SENTENCING</u>

AND NOW comes Defendant, Ronald Larry Locy, by and through his attorney, Martin A. Dietz, Esquire, and respectfully files the following Memorandum in Aid of Sentencing on the following basis:

Defendant, Ronald Larry Locy (hereinafter "Mr. Locy"), incorporates the facts set forth in the Presentence Investigation Report and in his objections to the presentence investigation report. Additionally, Mr. Locy asks the Court to consider the information and arguments contained herein in fashioning the appropriate sentence in this case.

I.    **Introduction**

Mr. Locy, an otherwise upstanding, law-abiding citizen, father and husband, will stand before this Honorable Court on February 21, 2018, humbled and ashamed of his actions.  He has accepted responsibility for his criminal conduct and on January 20, 2017, pled guilty to an information charging him with one count of embezzlement from UPMC. Mr. Locy cooperated with the government prior to his guilty plea.  Mr. Locy also entered into a structured settlement agreement in order to repay the insurance company that has already made UPMC whole.  As set

forth more fully within, upon consideration of all of the key sentencing factors under 18 U.S.C. § 3553(a), but especially Mr. Locy's history and characteristics and how he has handled this investigation and prosecution, a non-custodial sentence is appropriate and just for this case.

## II. The Law

Furthering the trend started by the United States Supreme Court in United States v. Booker, 543 U.S. 220 (2005), the Supreme Court restored the tremendous discretion that sentencing courts possessed prior to the promulgation of the sentencing guidelines. Gall v. United States, 522 U.S. 38, 128 S.Ct.586 (2007). Largely as a result of the Supreme Court's pronouncements in Gall and Kimbrough v. United States, 522 U.S. 85, 128 S.Ct. 558 (2007), the sentencing options available to district court judges have "significantly broadened." United States v. Moon, 513 F.3d 527, 544 (6th Cir. 2008), quoting Gall, 128 S.Ct. at 602. District courts are now free from any requirement that they mechanically adhere to the tight strictures of the guidelines and, importantly, sentencing courts are not required to even presume that the guidelines provide an appropriate sentence in a given case.

The Supreme Court has explained that the "reasonableness" of a sentence is the controlling query and it further held that any sentence imposed on a defendant, whether below, above or within the sentencing guidelines, is to be reviewed "under a deferential abuse-of-discretion standard." Gall, 128 S.Ct. at 598.  As set forth in United States v. Russell, 564 F.3d 200, 203 (3rd Cir. 2009), appellate courts must first

ensure that the district court committed no significant procedural error  in arriving at its decision[.] United States v. Wise, 515 F.3d 207, 217 (3rd cir. 2008).  Second,

"[i]f we determine that the district court has committed no significant procedural error, we then review the substantive reasonableness of the sentence[.]" Id. at 218. With respect to the first inquiry, a district court commits significant procedural error by, *inter alia*, failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence[.]  Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 597, 169 L. Ed. 2d 445 (2007), quoted in Wise, 515 F.3d at 217.

If there is no procedural error, an appellate court must "then, at stage two, consider its substantive reasonableness." United States v. Tomko, 562 F.3d 558, 567 (3rd cir. 2009) citing Levinson, 543 F.3d at 195.    Substantive review focuses not on one or two factors, but on the totality of the circumstances. Id. citing Gall, 128 S. Ct. at 597; United States v. Howe, 543 F.3d 128, 137 (3d Cir. 2008).    Citing Rita v. United States, 551 U.S. 338, 127 S.Ct. 2456, 169 L.Ed.2d 203 (2007), the Gall Court explained that a sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range".    128 S.Ct. at 596.  See also Kimbrough, supra.   The Third Circuit has recognized this stricture.  United States v. Smalley, 517 F.3d 208, 211 (3rd Cir. 2008). In Gall, noting that the sentencing guidelines should only be the "starting point" and the "initial benchmark" of a sentencing proceeding, the Court noted that the Guidelines are not the only consideration.    Id.   Next, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party."    128 S.Ct. at 596.   In doing so, however, a sentencing court is not permitted to presume that the Guidelines range is reasonable. 128 S.Ct. at 596-597.     The sentencing judge "must make an individualized assessment based on the facts presented" at sentencing.   128 S.Ct. at 597.     If the sentencing judge decides that a sentence outside the

3

applicable Guideline range is justified, the sentencing judge "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.  <u>Id</u>.   Continuing on, the <u>Gall</u> Court explained that a sentencing court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.  <u>Id</u>.; see <u>Wise</u>, 517 F.3d at 215-216 (reiterating <u>Gall</u> sentencing analysis).   In <u>United States v. Gunter</u>, 462 F.3d 237, 246 (3rd Cir. 2006), the Third Circuit interpreted <u>Booker</u> to require a district court to comply with the following three steps:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before <u>Booker</u>;
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account the Third Circuit's pre-<u>Booker</u> caselaw, which continues to have advisory force; and
>
> (3) Finally, district courts are required to exercise their discretion by considering the relevant §3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence.

See also <u>Tomko</u>, 562 F.3d at 567; <u>United States v. Levinson</u>, 543 F.3d 190, 194-195 (3rd Cir. 2008); <u>United States v. Charles</u>, 467 F.3d 828, 830-31 (3rd Cir. 2006); <u>United States v. Jackson</u>, 467 F.3d 834, 837 (3rd Cir. 2006).

These three factors, while not identical, are consistent with the considerations enunciated in <u>Gall</u> and continue to guide sentencing courts within the Third Circuit.  <u>Smalley</u>, 517 F.3d at 215; <u>Wise</u>,  517 F.3d at 216.

Notwithstanding the decreased rigidity of the sentencing guidelines, the first step in

determining a federal defendant's sentence requires a sentencing court to consider the federal sentencing guidelines because, in fact, they are a product of Congressional action.  United States v. Langford, 516 F.3d 205, 214 (3rd Cir. 2008) citing United States v. Goff, 501 F.3d 250, 257 (3rd Cir. 2007); Cooper, supra.   A sentencing court's failure to correctly calculate the correct guideline range "thwarts" reasonableness review and taints the remaining sentencing analysis. United States v. Ali, 516 F.3d 205, 214 (3rd Cir. 2008).   A sentencing court must correctly calculate the correct offense level, criminal history category, enhancements and sentencing range. Langford, 516 F.3d at 213.

After calculating the appropriate sentencing guidelines range, a sentencing court should also consider any motions for departure. Such a motion is distinct from a request for a "variance" from a sentencing guideline range.  See United States v. Vampire Nation, 451 F.3d 189, 195 (3rd Cir. 2006)(A departure is based on the sentencing guidelines. A variance is based on consideration of the §3553(a) factors).  See also Gunter, 462 F.3d at 247, n. 10.   As set forth in United States vs. Fumo,  655 F.3d 288, 317 (3rd Cir. 2011):

> There are "two types of sentences that diverge from the original Guidelines range . . . . A traditional sentencing 'departure' diverges . . . from the originally calculated range 'for reasons contemplated by the Guidelines themselves.' In contrast, a 'variance' diverges . . . from the Guidelines, including any departures, based on an exercise of the court's discretion under § 3553(a)." United States v. Floyd, 499 F.3d 308, 311 (3d Cir. 2007) (internal citations omitted). This distinction is more than mere formality. "Although a departure or a variance could, in the end, lead to the same outcome . . . it is important for sentencing courts to distinguish between the two, as departures are subject to different requirements than variances." Id. "[D]istrict courts should

be careful to articulate whether a sentence is a departure or a variance from an advisory Guidelines range." <u>United States v. Vampire Nation</u>, 451 F.3d 189, 198 (3d Cir. 2006).

In <u>Kimbrough</u>, the Supreme Court explained that a sentencing court's decision to adopt an offense level outside of the guidelines is permissible

> when the sentencing judge finds a particular case 'outside the heartland' to which the Commission intends individual Guidelines to apply. <u>Rita</u>, 551 U.S.at 2461.

128 S.Ct.at 575.

The "heartland" to which the <u>Kimbrough</u> Court alluded, is specifically described in the Guidelines:

> [t]he Commission intends the sentencing courts to treat each guideline as carving out a "heartland", a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted. . . .

<u>See</u> <u>United States Sentencing Guidelines</u>, Chapter 1, Part A 4(b); <u>United States v. Baird</u>, 109 F.3d 856 (3rd Cir. 1997); see also <u>United States v. Ali</u>, 508 F.3d 136, 147-148 (3rd Cir. 2008)

In <u>Koon v. United States</u>, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), a decision rendered long before <u>Blakely</u>, <u>Booker</u>, <u>Gall</u> and their progeny, the United States Supreme Court affirmed the Sentencing Commission's position with respect to the "heartland" policy announced in <u>United States Sentencing Guidelines</u>, Chapter 1, Part A 4(b).  Most importantly, the Court, in overruling the Ninth Circuit Court of Appeals, held that the decision of a District Court to depart from the sentencing guidelines should be overturned only where the sentencing court abuses its discretion.  <u>Koon</u>, 116 S.Ct. at 2043.   In fact, the decision of a sentencing court to depart from the sentencing guidelines shall be given "substantial deference, for it embodies the traditional exercise

6

of discretion by a sentencing court".  Id. at 2046; see also United States v. Sally, 116 F.3d 76 (3rd Cir. 1997).  Such deference is proper because "District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do".  Koon, 116 S.Ct. at 2047.  As recognized by the Supreme Court, the Sentencing Commission's less than rigid approach exists because "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision".  Id. at 2044; see also U.S.S.G. Chapter 1, Pt. A, intro. comment 4(b).

In formulating a sentence, the Third Circuit has recognized that departing from the sentencing guidelines is an important part of the sentencing process.  United States v. Sharapan, 13 F.3d 781 (3rd Cir. 1994); United States v. Gaskill, 991 F.2d 86 (3rd Cir. 1993); United States v. Lieberman, 971 F.2d 989 (3rd Cir. 1992).  The Third Circuit has explained that departures are important:

> because they offer the opportunity to ameliorate, at least in some respects, the rigidity of the Guidelines themselves.  District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence.

United States v. Gaskill, 991 F.2d 86 (3rd Cir. 1993).

Moreover, even when circumstances or factors which are viewed in isolation do not warrant a departure, a sentencing court may still depart when the circumstances or factors, in combination, "prove to be so exceptional as to provide a basis for departure." United States v. Hancock, 95. F.Supp. 280, 288 (E.D.Pa. 2000) citing United States v. Evans, 49 F.3d 109, 114 (3rd Cir. 1995); See Comment to U.S.S.G. §5K2.0.   Finally, "[t]he decision as to whether and to what extent departure

7

is warranted rests with the sentencing court on a case-specific basis". <u>Koon</u>, 518 U.S. at 98.

As set forth above, the Third Circuit, in <u>Gunter</u> and its progeny, has advised that after calculating the appropriate advisory sentencing guideline range, district courts are required to exercise their discretion by considering the relevant §3553(a) factors in setting the sentence it imposes regardless of whether it varies from the sentence calculated under the Guidelines. 462 F.3d at 246. Despite a sentencing court's mandate to correctly calculate the advisory guideline range, the directives of recent sentencing jurisprudence make clear that courts may no longer uncritically apply the guidelines. In fact, as set forth above, a sentence within the advisory guidelines is not presumptively reasonable. Such an approach would be contrary to the holdings <u>Gall</u> and the merits majority in <u>Booker</u>, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in <u>Booker</u>, directing courts to consider all of the §3353(a) factors, many of which the guidelines either reject or ignore.

As explained by the Third Circuit Court of Appeals in <u>Grier</u>:

> [u]nder an advisory Guidelines scheme, district courts should continue to make factual findings by a preponderance of the evidence and courts of appeals should continue to review those findings for clear error. **The only change in the equation is that, at the end of the day, the district court is not bound by the recommended Guidelines range, but must impose a sentence based on all the factors articulated in §3553(a)**. The court of appeals must then decide whether that final sentence is 'reasonable' (emphasis supplied).

<u>Grier</u>, 475 F.3d at 561.

8

In evaluating a sentencing court's factual findings, the Supreme Court has noted that a sentencing judge's firsthand experience with a particular case places the sentencing judge in a better position to evaluate the facts relative to sentencing.  In <u>Kimbrough</u>, the Supreme Court, citing <u>Rita</u>, acknowledged that a sentencing judge "has 'greater familiarity with . . . the individual case and the individual defendant than the [Sentencing] Commission or the appeals court.  128 S.Ct. at 574.  "He [or she] is, therefore, in a superior position to find facts and judge their import under 3553(a) in each particular case." <u>Id</u>. citing <u>Gall</u>, 128 S.Ct. at 598.

Justice Scalia explains the role of the sentencing guidelines in the post-<u>Booker</u> era in his dissent from <u>Booker</u>'s remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.  If the majority thought otherwise, if it thought the Guidelines not only had to be considered (as the amputated statute requires) but had generally to be followed its opinion would surely say so.

<u>Booker</u>, 543 U.S. at 305-306 (Scalia, J., dissenting in part).   As set forth above, a sentencing court is not permitted to presume that the Guidelines range is reasonable. <u>Gall</u>, 128 S.Ct. at 596-597. In fact, a sentencing judge may "disregard" the Guidelines.  <u>Rita</u>, 127 S.Ct. at 2466.   This notion now gives a sentencing court the discretion to disagree with and reject policy judgments of the Sentencing Commission and the Guidelines.

Although the <u>Gall</u> decision did not expand on the nature of the required § 3553(a) consideration, the Third Circuit has expressed what it deems necessary.  The Third Circuit

requires that the record "demonstrate the trial court gave "meaningful consideration" to the §3553(a) factors." See United States v. Vargas, 477 F.3d 94, 101-102 (3rd Cir. 2006); United States v. Manzella, 475 F.3d 152 (3rd Cir. 2007); United States v. Parker, 462 F.3d 273, 276 (3rd Circuit 2006), citing Cooper, 437 F.3d at 329, n3. A district court need not "discuss and make findings as to each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing", however, the record must reflect that the district court considered the § 3553(a) factors and that those factors were "reasonably applied to the circumstances of the case." Id.   A trial court should not sway from imposing its independent judgment in such considerations and great deference is given to the trial court "because it is in the best position to tailor a sentence to a particular defendant and his offense."  Vargas, 477 F.3d at 101 citing Cooper at 329-332; see also Jackson, 467 F.3d at 841; United States v. Lloyd, 469 F.3d 319, 323 (3rd Cir. 2006); United States v. Dragon, 471 F.3d 501 (3rd Cir. 2006).

"Meaningful consideration" includes addressing the arguments of the parties which have legal merit and correctly calculating the appropriate guideline range. Cooper, 437 F.3d at 329. A sentencing court "need not discuss every argument made by a litigant if an argument is clearly without merit." Cooper, 437 F.3d at 329.   "Nor must a court discuss and make findings as to each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing. Cooper, 437 F.3d at 329.  A sentencing court must, however, address a defendant's colorable arguments concerning specific facts germane to this third step analysis.   United States v. Sevilla, 541 F.3d 226, 232 (3rd Cir. 2008).

Additionally, "a rote statement of the §3553(a) factors should not suffice if at sentencing

either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." Cooper, 437 F.3d at 329. The Third Circuit has explained that, in reviewing a district court's sentence, "we have to satisfy ourselves, before we can conclude that the judge did not abuse his [or her] discretion, that he [or she] exercised his [or her] discretion, that is, that he [or she] considered the factors relevant to that exercise." Cooper, 437 F.3d at 329.

Moreover, after consideration of the relevant factors, a sentencing court can vary (i.e., a "variance") from the advisory guidelines range.  Gunter, 462 F.3d at 247, n. 10.   In Gall, the Court's decision categorically rejected an "appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guideline range". 128 S.Ct. at 595; see also Levinson, 543 F.3d at 196.   Rather than requiring extraordinary circumstances to justify a deviation from the guidelines, the Court explained that a district judge must explain his or her reasons for a variance in a particular case with sufficient justifications.  Id.   As set forth in Levinson:

> While the Guidelines are no longer mandatory, United States v. Booker, 543 U.S. 220, 245 (2005), and no "extraordinary circumstances" are needed to justify a sentence that varies from the recommended results, Gall, 128 S.Ct. at 595, and while there is no mathematical formula for determining whether a district court's justifications for a variance are sufficient, id. at 594-95, we nonetheless must be satisfied that, broadly speaking, an adequate justification is provided on the record.

543 F.3d at 196.   As long as a sentence falls within the broad range of possible sentences that can be considered reasonable in light of the § 3553(a) factors, a reviewing court must affirm.

United States v. Jones,   566 F.3d 353, 366 (3rd Cir. 2009) citing Wise, 515 F.3d at 218.  Where a district court decides to vary from the Guidelines' recommendations, an appellate court "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Tomko, 563 F.3d at 56, citing Gall, 128 S.Ct. at 597.


According to Gall, Booker and its related Third Circuit authority, in determining the minimally sufficient sentence, sentencing courts are required to consider the following 18 U.S.C. §3553(a) factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed –
    (A) To reflect the seriousness of the offense, to promote respect for the law, and to
        provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical
care,             or other correctional treatment in the most effective manner;

3) the kinds of sentences available;

4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant
      as set forth in the guidelines –
        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title
          28, United States Code, subject to any amendments made to such guidelines
          by act of Congress (regardless of whether such amendments have yet to be
          incorporated by the Sentencing Commission into amendments issued under
          section 944(p) of title 28); and
        (ii) that, except as provided in section 3742(g), are in effect on the date the
          defendant is sentenced; or
    (B) in the case of a violation of probation or supervised release, the applicable guidelines
      or policy statements issued by the Sentencing Commission pursuant to section
      994(a)(3) of title 28, United States code, taking into account any amendments made
      to such guidelines or policy statements by act of Congress (regardless of whether
      such amendments have yet to be incorporated by the Sentencing Commission into
      amendments issued under section 994(p) of title 28);

5) any pertinent policy statement—
    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28,
      United States Code, subject to any amendments made to such policy statement by act of

Congress (regardless of whether such amendments have yet to be incorporated by the
Sentencing commission into amendments issued  under diction 994(p) of title 28);
and
(B) that, except as provided in section 3742(g), is in effect on the date the defendant is
sentenced.

6) the need to avoid unwarranted sentence disparities among defendants with similar records who
have been found guilty of similar conduct; and

7) the need to provide restitution to any victims of the offense.


The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence
sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2",
as set forth above.    This directive, commonly called "sentencing parsimony" is defined as the
least restrictive sentence necessary to achieve the purposes of sentencing.   United States v.
Dragon, 471 F.3d 501, 503 (3rd Cir. 2006);  See also Kimbrough, 128 S.Ct. at 575-576 (a district
court's judgment that a particular defendant's sentence was sufficient but not greater than
necessary is entitled to great weight, even if the district court's judgment is based in part of its
disagreement with the policies behind an applicable guideline).   Other statutory sections also
give the district court direction in sentencing. Under 18 U.S.C. §3582, imposition of a term of
imprisonment is subject to the following limitation: in determining whether and to what extent
imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to
"recogniz[e] that imprisonment is ***not*** an appropriate means of promoting correction and
rehabilitation" (emphasis added); see also United States v. Manzella, 475 F.3d 152 (3rd Cir.
2007) (It is the policy of the United States Congress, clearly expressed in law, that defendants
not be sent to prison or held there for a specific length of time for the sole purpose of
rehabilitation. Instead, that legitimate goal of sentencing is to be accomplished through other

authorized forms of punishment).

"[S]entencing courts have historically been afforded wide latitude in considering a defendant's background at sentencing". United States v. Berry, 553 F.3d 273, 279 (3rd cir. 2009) citing United States v. Paulino, 996 F.2d 1541, 1547 (3rd Cir. 1993).  Under 18 U.S.C. §3661, "**no limitation** shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).  As a practical matter, this statutory language trumps the now-advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth and virtually any other facts that fits within the ambit of §3553(a).

## III.    Nature and Circumstances of the Offense and History and Characteristics of the Defendant

Mr. Locy requests that this Court impose a non-custodial sentence.    There is no limitation on the information that this Court can consider in fashioning an appropriate sentence. See 18 U.S.C. §3661; 18 U.S.C. §§3553(a)(1).    While the offense of conviction is certainly serious, Mr. Locy believes that there are notable facts and circumstances concerning contributing to Mr. Locy's behavior during the offense of conviction and concerning his post-offense efforts to redeem himself which warrant the imposition of a non-custodial sentence in this case.

14

As set forth more fully below, there are certain facts and circumstances surrounding Mr. Locy's offense and his post-offense conduct that warrant a non-custodial sentence, a sentence that Mr. Locy recognizes would be below the advisory guideline range.  Mr. Locy does not make his request gratuitously.   This case presents the Court with a unique justification for such a sentence.  Mr. Locy's sister, Toni Locy, will address the Court at sentencing.  Ms. Locy is the head of the Department of Journalism and Mass Communications at Washington and Lee University in Lexington, Virginia.  She was a journalist for 25 years before she became a college professor. She began her career at the now defunct Pittsburgh Press in 1981. Most importantly, Toni Locy is Mr. Locy's oldest sister.  She has intimate knowledge of the facts set forth herein and will address the Court to provide much more specific information about Mr. Locy and the facts set forth below.

Mr. Locy is forty-nine years old, but will turn fifty on the day of sentencing.  He was raised by a single mom and is the youngest of six (6) children.  His mother describes him as a home body, a good son who never gave her any trouble.  (*See* Character Letter of Priscilla Armstrong).  For his entire life, Mr. Locy has led an otherwise lawful life, with no prior criminal record.  Mr. Locy has been married for nearly 27 years and is the proud father of three (3) children.   Until the circumstances that have brought him before the Court, he has always been gainfully employed and he has fully supported his family.

To Mr. Locy, his wife and children are his entire world.  His oldest daughter graduated from the University of California at Berkeley last year with a double major in English and Cognitive Science.   His middle child, his only son, is a sophomore at the University of Washington, planning to major in Economics.   Tragically, Mr. Locy's youngest daughter, Cameron, passed away in 2012 at eight (8) years old, following a lengthy illness, which is

described more fully below.

Eleven (11) years before his daughter's death, in July 2001, Mr. Locy was offered a job as a mid-level supervisor at UPMC. From there, he worked his way up in the UPMC Health Plan's Claims Department, where he was promoted to senior manager in 2005, director in 2007 and senior director in 2010. Mr. Locy has always been a hard worker, dedicated to doing his job well. For his entire adult life, Mr. Locy worked in the health care industry. After originally starting in the mailroom at another heath care company, Mr. Locy worked his way up to a mid-level supervisory job. Balancing family and work, however, has always been a priority. For example, he worked nights when his first daughter was born in 1995, so he could take care of her during the day while his wife, who also worked for a health care company processing claims, worked during the day.

Mr. Locy's youngest daughter, Cameron, was born on November 2, 2003, and spent the first month of her life in the NICU at Children's Hospital where doctors inserted a feeding tube in her abdomen because she could not eat on her own. Even with this medical intervention, Cameron's health deteriorated and she was not gaining weight like she should have been. In early 2005, at just 15-months-old, Cameron was rushed into surgery at Children's Hospital where doctors performed an emergency tracheotomy.

Doctors explained to the Locys that Cameron had been slowly suffocating because her vocal cords had been damaged when she experienced meconium during birth, and a doctor responded with aggressive methods of suctioning. As a result, Cameron's vocal cords had nearly fused shut and had narrowed her airway, causing her to burn every available calorie just to

breathe. By then, doctors had realized that she had a rare neurological disorder: her cerebellum[1] was about a third of the size it should have been.

As a result of this medical condition, Cameron could not talk or walk or even sit up by herself.  She was fed by a feeding tube and breathed via machines, requiring around-the-clock care and attention.  Like any good parents, Mr. Locy and his wife devoted their lives to her survival.  In addition to caring for Cameron, however, Mr. and Mrs. Locy also had two healthy, vibrant children requiring their attention.  Consequently, Mr. Locy tended to their oldest children, helping them with homework, attending their school events, and coaching their soccer teams. Mrs. Locy, in turn, became Cameron's primary care giver.  She devoted all of her time and energy on making sure Cameron's needs were met, which included following a strict regimen of anti-seizure medications and breathing treatments as well as tending to her basic needs, such as bathing her, feeding her, and changing her.

Less than a month after receiving the tracheotomy, Cameron was rushed back to the hospital, as Cameron's organs went into failure. The doctors were able to save her life by flooding her body with fluids but the fluids settled into her lungs, leaving her with breathing problems for the rest of her life.  Cameron spent the next five months in the PIC-U at Children's Hospital.  A week after being discharged she was flown by helicopter from Canonsburg Hospital to Children's with another medical emergency.

Again in 2007, 2008, and 2009, the Locys rushed their young daughter to the emergency room.  Countless times, both at the hospital and while rushing to get there, the Locys almost lost

---

1.      The cerebellum "refines your body's functions through tasks like balance, coordination, posture and motor learning.  Essentially, the cerebellum does not initiate movement, but manages [or coordinates] it." *Getting to Known Your Brain: Cerebellum." UPMC (July 22, 2015), available at,*

her.  For example, Mr. Locy's sister, Toni, who will address this Court at the sentencing hearing, recounts:

> Cameron turned blue in her mother's arms as I drove on the shoulder of the Parkway West, hazard lights flashing, as I tried to get to Children's Hospital in Oakland during rush hour on a Friday evening.  I remember rolling down all the windows of my SUV, screaming for help as I pulled up the steep hill and into the hospital driveway. Two nurses on a smoke break ripped Cameron out of Tracy's arms and sprinted into the ER, where doctors somehow brought her back to us.

During the last two (2) years of her life, from 2010 until 2012, Cameron experienced numerous seizure-like episodes – watching, waiting for them to pass, was terrifying for anyone to witness.  For Mr. Locy, it was another reminder of how helpless he was – unable to protect his baby girl from pain and suffering.  This helplessness coupled with fear, grief, and, anger at the unfairness of it all crippled Mr. Locy emotionally.  Attached to this memorandum are a series of letters[2] from those offering their support for Mr. Locy, describing the incredible man that he is; and also explaining that Mr. Locy tried to manage, on his own, his work, marriage, two young, healthy children, and an ill child.  Undoubtedly, Mr. Locy displayed incredible strength and fierce dedication during those eight (8) years but no one should do so on their own.  Indeed, in trying to keep life "normal," especially for his two oldest children, he lost himself along the way.

Sadly, Cameron died on February 19, 2012.  Cameron's death crippled Mr. and Mrs. Locy, understandably, having a devastating impact on them.  Mr. Locy was not only grieving the loss of his child but also watching, helplessly, as his wife tried to cope with the loss of Cameron

---

http://share.upmc.com/2015/07/getting-to-know-your-brain-cerebellum/

2.      Attached as collective Exhibit "A" are character letters in support of Mr. Locy.

after literally being by her side for eight (8) years.  Nevertheless, they pressed on, recognizing that their two older children needed them.  Their other daughter and son needed their parents to celebrate milestones in their young lives—their proms, senior nights, and high school graduations, as well as guidance in choosing where they went to college.

Then, two (2) years after Cameron's death, based on the allegations that form the basis of this case, Mr. Locy was fired from his job at UPMC in or around June 2014.  He went to work for another health care company in Texas after being fired, but after a grand jury subpoena was served on that heath care company relative to the investigation in this case, Mr. Locy was fired from that position too.  As a result of his conduct, for which he accepts full responsibility, Mr. Locy has lost everything he worked for in his adult life.  He was fired from his job at UPMC.  He could not pay for basic necessities without help from family members.  Additionally, as a convicted felon, save working for his sister, he is unemployable.  Mr. Locy recognizes that his life was shattered by his own actions, but he is determined not to make the same mistakes again.  Mr. Locy has put himself in the position, at the age of 50, of starting life all over again.  Even so, he is determined to remain a productive member of society – this time, however, relying on the love, support and help from his family and friends.

For example, in March of 2017, Mr. Locy's sister, Toni, purchased a Honeybaked Ham Café franchise in Olympia, Washington. Mr. Locy agreed to run the store for his sister.  Mr. Locy has invested hundreds of hours of time and sweat-equity into managing the HoneyBaked Ham business.  He has taken training classes and worked with his sister to formulate a detailed business plan, helping her turn, what was at the time of purchase a failing business, into a profitable one.  In fact, the store has already surpassed the previous owner's performance in

catering and its café business.

Mr. Locy also requests that this Court consider that Mr. Locy has executed a settlement agreement with the Zurich American Insurance Company ("Zurich") and he has made good faith efforts to comply with the terms of the settlement agreement.   Contrary to the allegations contained in the presentence report, UPMC is not owed restitution in this case.   Zurich paid an insurance claim to UPMC that satisfied any restitution owed to UPMC.  However, Zurich had notified Mr. Locy that it intended to pursue a claim against Mr. Locy for indemnification of the amounts it paid to UPMC.    Mr. Locy and Zurich reached a settlement that has been memorialized in a Settlement Agreement and Release which will be provided to the Court at sentencing.    Mr. Locy has already made a $90,000 payment pursuant to the settlement agreement.   Mr. Locy fully intends to comply with the remaining terms of the settlement agreement in order to satisfy his obligations to Zurich.   In order to ensure that he can honor his obligations to Zurich and provide for his family, Mr. Locy hopes that this Court will impose a non-custodial sentence that will permit him to continue operating his sister's HoneyBaked Ham Cafe in Washington state.

Mr. Locy also asks the Court to consider the words of various supporters.   Their comments are chronicled in the various character letters that are attached hereto.  As the Court can see from the letters, Mr. Locy is a man of character and responsibility.   His desire to redeem himself is sincere.  The letters come from family members and friends and they detail Mr. Locy's personal traits and characteristics.

## IV. The Sentencing Guidelines Calculation

This Court is also to consider the sentencing guidelines as a starting point in fashioning an appropriate sentence.   Mr. Locy recognizes that the advisory sentencing guideline range set forth in the final presentence investigation report is 30-37 months' imprisonment which range is in Zone C of the sentencing guidelines chart.

## V. Types of Available Sentences

By statute, a court must consider the kinds of sentences available in this case. 18 U.S.C. §3553(a)(5).  This Court has a variety of sentencing options available to it.  However, there is no mandatory term of imprisonment applicable in this case.   As set forth in the Presentence Investigation Report, this Court may sentence Mr. Locy to a period of probation in this case provided the sentence includes an order of restitution.  Mr. Locy is eligible for a sentence of up to no less than 1 nor more than 5 years' probation.  See 18 U.S.C. § 3561. In considering whether an alternative sentence, below the guideline range, will further the goals of sentencing, Section 3553(a)(2) dictates that some of the key considerations include: that the sentence "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense", "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  For the reasons set forth herein, as these considerations pertain to Mr. Locy, all are adequately met and justice will still be served with a sentence of probation.

**A.      Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense**

Mr. Locy has incurred and will continue to incur significant consequences as a result of his conduct.  The publicity from his guilty plea has caused Mr. Locy great humiliation and embarrassment among his family, friends, business colleagues and other peers.  This informal form of punishment has been real and severe. Mr. Locy is virtually unemployable in healthcare, an industry in which he worked for nearly his entire adult life.  After his separation from UPMC, Mr. Locy went to work for a company in Texas as an assistant vice president. Mr. Locy relocated his family to Texas.  After federal authorities served a grand jury subpoena on his new employer, seeking Mr. Locy's personnel file, Mr. Locy was terminated from the position.  Despite his best efforts, he was unable to find new employment until his sister offered him employment in her HoneyBaked Ham Café.

This Court is permitted to vary from the advisory sentencing guidelines for such reasons.  See, e.g. United States v. Gaind, 829 F. Supp. 699, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); United States v. Vigil, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); United States v. Samaras, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

As stated above, Mr. Locy is statutorily eligible for a term of probation.  While Mr. Locy is respectfully requesting a probationary sentence, he in no manner means to demean the seriousness of the crime for which he has been convicted.  Probation, however, is a serious punishment – a punishment which Mr. Locy does not take lightly.   There is no question that such sentences are punitive.  Notably, the Supreme Court has noted that probationary sentences substantially restrict a defendant's liberty.   Gall, 128 S.Ct. at 595. (In imposing a probationary sentence, the Court noted "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. §5B1.3.  The Supreme Court has expressed that a probationary sentence "rather than 'an act of leniency,' is a 'substantial restriction of freedom.'" Gall , 128 S.Ct. at 593.  In Gall, the Supreme Court referenced the district court's memorandum opinion where the judge stated:

> [The defendant] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term.

Id.   In Gall, the advisory guideline range suggested a term of imprisonment of 30-37 months.  The defendant in Gall was not the beneficiary of a §5K1.1 motion.

Additionally, there is support within the Third Circuit for a probationary sentence in the face of an advisory guideline range that suggests imprisonment.  The Third Circuit affirmed a probationary sentence in a case where the advisory guidelines range was incarceration. See United States v. Howe, 543 F.3d 128 (3rd Cir. 2008).     In Howe, the defendant was convicted of two counts of wire fraud.  Prior to pleading guilty, the defendant had been interviewed by law enforcement officials but provided "questionable and inconsistent" statements to the government. The defendant was convicted after trial and his advisory sentencing guideline range was 18-24 months' imprisonment.   Like the defendant in Gall, the defendant in Howe was not the beneficiary of a §5K1.1 motion.   After a sentencing hearing, the district court sentenced the defendant to 24 months' probation including three months' home detention. 543 F.3d at 131.   In sentencing the defendant to that particular sentence, the district court relied on circumstances such as the defendant's remorse, his pre-offense honorable and lawful life, lack of criminal history and service in the U.S. military. 543 F.3d at 137.   The government appealed the probationary sentence as unreasonable.  The sentence was affirmed.  The Third Circuit explained that while none of these circumstances alone may have been extraordinary to warrant the variance, the totality of these circumstances justified the variance invoked by the district court. 543 F.3d at 137, 138.

Similar to the defendant in Howe, Mr. Locy has demonstrated remorse, has led a pre-offense honorable and lawful life and has no criminal history.  Mr. Locy, however, possesses additional qualities that warrant consideration, including entering into a settlement agreement

with Zurich.  These considerations as well as those set forth within, suggest that a term of probation is appropriate and just.

**B.      Deterrence**

A sentence of probation also satisfies the deterrence prong of Section 3553.  Under this prong of Section 3553(a), courts assess whether a sentence will provide sufficient specific deterrence to the defendant from committing future crimes, and general deterrence to the public, deterring others from committing similar offenses.

**1.      Specific Deterrence**

Mr. Locy has been thoroughly deterred by the consequences he has already experienced, as set forth more fully above, including the tremendous humiliation and shame he has brought onto himself and his family.  Under 18 U.S.C. §3582, the judge is required to "recogniz[e] that imprisonment is ***not*** an appropriate means of promoting correction and rehabilitation" (emphasis added); see also United States v. Manzella, 475 F.3d 152 (3rd Cir. 2007) (It is the policy of the United States Congress, clearly expressed in law, that defendants not be sent to prison or held there for a specific length of time for the sole purpose of rehabilitation. Instead, that legitimate goal of sentencing is to be accomplished through other authorized forms of punishment).  Thus, a term of probation satisfies the goal of specific deterrence.

2.      **General Deterrence**

Under the circumstances of this case, a custodial sentence is not required to achieve the goal of deterring others from violating the law.  Here, the collateral consequences of the offense, including: the publicity surrounding this case, the financial and employment impact, as well as any additional non-custodial punishment court could impose, satisfy the goals of general deterrence.

Frequently, the government argues that a prison sentence is the only way to vindicate the government's interest in obtaining justice and promoting deterrence.  Mr. Locy wishes to point out that while there is no doubt that the likelihood of being arrested and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id*; see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm; Restorative Justice and While Collar Crime*,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").   In white-collar cases, research has disclosed that there is no difference in the deterrent effect of a probationary sentence and that of imprisonment.  *See* David Weisburd *et al.,* Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent

effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al*. Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-1S (2011). In fact, "[t]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders." *See,* United States v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006). Moreover, another study suggests that it is the criminal justice process, not a lengthy prison sentence, that sends the most convincing message:

> [Studies show] no significant difference in recidivism between white-collar offenders sentenced to prison and similar offenders who did not receive a prison sentence. This finding is consistent with the research on specific deterrence and conventional crime. Based on their review of the literature, these researchers stated, "[a]t least since the 1970's, criminologists have consistently shown that those who are sentenced to prison have, at best, about the same rates of recidivism as non-imprisoned offenders, and in some cases, a much higher rate. They speculated that perhaps the criminal process itself–charge, trial, conviction, and sentencing– has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence. "Whatever specific deterrence is gained," they argue, "may be produced before the imprisonment sanction is imposed."

Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. U. L.J. 485, 495 (1999).

### C.    To Protect the Public from Further Crimes of the Defendant

While recidivism is an important factor for a sentencing judge to consider, Mr. Locy poses no threat to the community and thus it is not a factor weighing in favor of a term of

imprisonment in this case.  *See* <u>Pepper</u>, 131 S.Ct. 1229 (finding the likelihood that the defendant will engage in future criminal conduct is a factor that sentencing courts must consider in imposing sentence). Mr. Locy will never engage in unlawful conduct again or become a recidivist of any type of crime.

Mr. Locy asks the Court to consider that he presents a minimal risk of reoffending.   Until his current legal troubles, Mr. Locy's life was spent as a law-abiding citizen. As set forth above, will turn 50 on the day of sentencing and he has no prior criminal record.  Defendants "over the age of forty…exhibit markedly lower rates of recidivism in comparison to younger defendants." <u>See</u>, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u>, at p.28 (2004), <u>www.ussc.gov/publicat/Recidivism_General.pdf</u>. (stating that for those defendant in Criminal History Category I, the recidivism rate for defendants who are over 50 is 6.2%, whereas the recidivism rate for such defendants between the ages of 41 and 50 is 6.9%, and for those defendants who are between ages 21 and 40, it is between 12% and 22%). Additionally, there is also statistically an extremely low (and arguably nonexistent) risk of recidivism in this case.  The United States Sentencing Commission ("Sentencing Commission") in a recent study[3] identified several characteristics that are indicators of reduced risk of recidivism, including the following:

- <u>Age</u>:  Recidivism rates decline as age increases, from 71.1% under age 21, to 14.0% over the age of 60.[4]

---

[3].     Recidivism Among Federal Offenders: A Comprehensive Overview ("Recidivism Study") (Mar. 2016), *available at,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

[4].     *Id*. at Appendix A-1, p. 44.

- <u>Education</u>:  Recidivism rates decrease with educational level.  Offenders who are college graduates have a 19.1% rate of recidivism.[5]

- <u>Lack of criminal history</u>:  Individuals who have zero criminal history points have the lowest rate of recidivism.[6]

Other factors are also of import in considering a defendant's likelihood of recidivism, as detailed in the 2004 Sentencing Commission study[7]:

- <u>Marital Status</u>:   Category I Offenders, who were married and/or divorced have the lowest rate of recidivism.[8]

- <u>Employment Status</u>:   Category I Offenders, who were employed the year prior to the instant offense, have the lowest rate of recidivism, 12.7%.[9]

Here, Mr. Locy is a college graduate, married, has a solid record of legitimate employment and a criminal history score of zero.   Until his current legal troubles, Mr. Locy's life was spent as a law-abiding citizen.   Consequently, both the Sentencing Commission studies and case law support the determination that Mr. Locy poses a very low risk of recidivism.   See, e.g., <u>United States v. Darway</u>, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); <u>United States v. Hamilton</u>, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court  abused its discretion in not taking into account policy considerations with regard to age recidivism  not included in the Guidelines"); <u>United States v. Holt</u>, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be

---

5.        *Id.*

6.        *Id.* at Appendix A-1, p. 40.

7 .       "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," United States Sentencing Commission (2004), *available at,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

8.        *Id.* at p. 29.

involved in a violent crime); <u>United States v. Urbina</u>, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar  5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive  work history, and strong family ties); <u>United States v. Cabrera</u>, 567 F. Supp. 2d 271, 279 (D. Mass.  2008) (granting variance because defendants "with zero criminal history points are less likely to  recidivate than all other offenders"); <u>Simon v. United States</u>, 361 F. Supp 2d 35, 48 (E.D.N.Y. 2005)  (basing variance in part on defendant's age of 50 upon release because recidivism drops  substantially with age); <u>United States v. Nellum</u>, 2005 WL 300073 at (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); <u>United States v. Ward</u>, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains  from criminal conduct" before committing his first offense).   Mr. Locy respectfully requests that this Court consider the remote likelihood of recidivism in this case and impose a probationary sentence.

## VI.     The Need to Provide Restitution to Any Victims of the Offense

An additional concern of the federal statutory scheme is the need to provide restitution to any victims of the offense of conviction.   18 U.S.C. §3553(a)(7).   UPMC, the victim in this case, has been made whole, as its insurance company, Zurich, paid UPMC's loss claim in full.  Mr. Locy has entered into a settlement agreement with Zurich and is current on his payments under the settlement agreement.  As it stands, the continued operation of the HoneyBaked Ham Café will

---

9.     *Id.*

permit Mr. Locy to fulfill the terms of settlement agreement he has reached with Zurich.  Thus, while the technical victim has been made whole, Mr. Locy's ability to honor the settlement agreement with Zurich will be met with a term of probation.[10]


## VII. The Need to Provide Educational or Vocational Training, Medical Care or Correctional Treatment

Based on the foregoing, providing Mr. Locy with needed educational or vocational training, medical care or other correctional treatment while legitimate considerations, are not issues which warrant a custodial sentence in this case.  See 18 U.S.C. §§3553(a)(2)(D).  In fact, as set forth above, Mr. Locy is currently operating his sister's business and the continued operation of that business will permit Mr. Locy to fulfill the terms of settlement agreement he has reached with Zurich, it will permit him to provide for his family and it evinces his desire to redeem himself for his previous indiscretions.   These facts suggest that a non-custodial sentence is appropriate in this case.


## VIII. Conclusion

As set forth above, Mr. Locy will turn 50 years old on the day of sentencing and he has led an otherwise law-abiding life. He is a good man.  The offense of conviction occurred during a period in Mr. Locy's life where he was experiencing the devastating impact of caring for a child who was born critically ill.  His family was, to say the least, in complete turmoil

---

[10]   Based on the PSR, it is clear that Mr. Locy has no ability to pay a fine. and therefore he asks that no fine be

and Mr. Locy made a tragically terrible decision. Mr. Locy absolutely accepts responsibility for his actions in this case.   He agreed to plead guilty to an Information and agreed to waive an indictment in this case.   Since his unlawful conduct, Mr. Locy has taken great strides to begin anew. He recognizes, however, that he cannot forge a new path for himself on his own. Instead, Mr. Locy relies upon his support system of loving family and friends who have vowed to help Mr. Locy make the most of his next fifty years.   Mr. Locy has built momentum in running his sister's business that will enable him to provide for his family and to honor the settlement agreement he entered with Zurich.   It is respectfully requested that the Court consider the comments herein, invoke its discretion and vary from the advisory sentencing guideline range and impose a non-custodial sentence in this case.

Respectfully submitted,

    s/ Martin A. Dietz             .
Martin A. Dietz, Esquire
Pa. I.D. No. 69182

The Mitchell Building
304 Ross Street, Suite 505
Pittsburgh, PA 15219
(412) 261-5520

Attorney for Defendant,
Ronald Larry Locy

imposed in this case.